## MINNIE ROYALS ET AL. v. A. LACEY.

### Decided April 22, 1903.

**1.—Acknowledgment—Deed—Married Woman—Impeaching Certificate.**

Where the certificate of an officer, since dead, to the acknowledgment by a married woman of a deed of homestead property was impeached by the unsupported testimony of the wife to the effect that the deed was never read or explained to her by the officer, and that she did not know a deed was then being made, and on this latter point she was contradicted by other witnesses, a finding upholding the deed and certificate was supported by the evidence.

**2.—Arbitration—Compliance with Agreement.**

Where plaintiffs sued to recover homestead property which they had previously conveyed to defendant's vendor, alleging that their deed of it had never been duly executed by the wife, it was not error for the court to refuse to permit plaintiffs to prove that there was a controversy about the deed which was by agreement submitted to arbitration, and that the arbitrators found that the deed was to be returned to plaintiffs, and that the money and notes were to be returned to the purchaser, where it was not shown that such alleged arbitration occurred before the land was sold to defendant, nor that plaintiffs had offered to return the purchase money notes and refund the purchase money paid.

Appeal from the District Court of Hunt. Tried below before Hon. H. C. Connor.

*Evans & Elder* and *John G. Nix,* for appellants.

*J G. Matthews,* for appellee.

KEY, ASSOCIATE JUSTICE.—From a judgment in favor of the defendant, in an action of trespass to try title, the plaintiffs have appealed. The only issue of fact in the court below was whether or not the plaintiff Minnie Royals, who was a married woman, had executed a deed in the manner required by law. The deed referred to was in the usual form, was signed by Minnie Royals and her husband C. H. Royals, and the certificate of acknowledgment was in compliance with the requirements of the statute. The land was homestead at the time that the deed was made. The notary public who made the certificate of acknowledgment was dead at the time of the trial.

Mrs. Royals testified as follows: "I did not sign the deed nor authorize any other person to sign it for me. I did not appear before J. F. Puckett, the notary before whom the same purports to have been acknowledged, for the purpose of acknowledging the deed. The deed was never read over or explained to me by said notary or by any other person, and I did not acknowledge that I had signed the conveyance, and did not in any manner acknowledge the same to be my act and deed. I can neither read nor write. My husband C. H. Royals had sold the place and wanted me to join him in the conveyance and I refused to do so. On the morning of the 3d day of March, 1898, I went with my husband in a buggy to Celeste to get some medicine for

my sick boy, and when we drove up in front of McWilliam's drug store, I saw Mr. Puckett standing in front of the house, and he motioned for me to come to him, and Mr. Royals said to me that there was Mr. Puckett, who perhaps wanted to see me. I went into the store. I followed Mr. Puckett to a little off in the rear of the house. When we got in there, there was a man in there who was a stranger to me, but whom I have since learned was Dr. White. Mr. Puckett laid a paper on the table and said 'Put your name down here.' I answered, 'I can't write.' Puckett said to the man standing in the door, 'You put her name down; I am so nervous I can't write.' The man sat down preparatory to writing the name, and remarked to me, 'What are your initials?' Mr. Puckett replied, 'Put it down Mrs. Minnie Royals.' That was all that was said and done. Mr. Puckett said, 'That is all,' and I got up and walked out. I never saw any deed. I did not know what the paper was. I never saw it before nor since. Mr. Puckett never told me what the paper was, and no one else informed me what it was."

Cross-examination: "I did not get the deed and hand it to my husband and he deliver it to Clymer in my presence. Mr. Royals kept his papers in a desk, and if I got any papers for him, I did not know what they were. I did not tell anyone that morning that I was going down to sign a deed to my home. We lived on the place until December following. I told Mrs. Hudson in McWilliams' drugstore that I did not intend to sign my rights away to my home. We moved to south Texas in December, 1898; we bought a place there, built a house on it and made two crops; sold out the place; I signed the deed and we moved back."

Re-examination: "I did not leave my home voluntarily. My boy was bad sick, and my husband said he was going to carry him any way, and I went because he was going to carry my boy. He bought the place down there and improved it over my protest. I told him that if he was going to move there that we wanted to rent until we could come back to our home. If the deed was delivered to Clymer in my presence at my house I did not know what they were doing. I knew that Mr. Royals wanted to sell and wanted me to sell, and as soon as I found out that Clymer was claiming the place and had paid Mr. Royals some money and notes, I insisted that they all be returned to Mr. Clymer. Mr. Royals went to see him two or three times and sent for him. They had an arbitration over the matter, and I thought it was all settled until I moved to south Texas."

Dr. C. E. White testified that the notary public and Mrs. Royals came into his office, and one of them requested him to sign Mrs. Royals' name to a paper, which he did, and left the office immediately.

E. T. Clymer, the grantee in the deed, and under whom the defendant Lacey holds, testified that he purchased the land in controversy; that when he went to Mr. Royals' house to close up the transaction, Mr. Royals told his wife to give him the deed and notes, which she did,

bringing them out of an adjoining room, whereupon Clymer signed the notes and paid Royals $150.

Mrs. Royals' acknowledgment to the deed was dated March 3, 1898, and a witness named Beulah Stallings testified that on that particular day she saw Mrs. Royals and her husband passing by her place and going to the town of Celeste, where the deed was acknowledged; that she had a conversation with Mrs. Royals, and the latter told her that she was going that morning to sign her land away.

Mrs. Emma C. Hudson testified that about the 1st of March, 1898, she saw Mrs. Royals in a drugstore in Celeste, and asked her what she was doing there, and she said she had come to make the deed to her land.

Mrs. Lucy Clymer testified that she was present when the deed was delivered to her stepson, E. T. Clymer, and that Mrs. Royals went to the desk and got it, and either she or her husband delivered it to E. T. Clymer, and that Mrs. Royals said nothing by way of objection to selling the property.

The burden rested upon the plaintiffs to show that the certificate of acknowledgment was false; and considering the certificate itself, which was an official act of the deceased officer, as evidence, and the testimony submitted by the defendant which tended to support the certificate and overthrow the testimony given by Mrs. Royals, we hold that the judgment is amply supported by testimony.

The only other question presented relates to the action of the court in refusing to permit plaintiffs to prove "that the controversy about the deed was by agreement submitted to arbitration, and that the arbitrators found that the deed was to be returned to the plaintiffs, and that the money and notes were to be returned to Clymer." It is not shown that the alleged arbitration occurred before Clymer sold the land to the defendant; nor did the plaintiffs offer to prove such facts as would make the arbitration binding upon the defendant. Furthermore, if it was a statutory arbitration, it should have been reported to the court, and the award entered as a judgment of the court. But whether a statutory or common law arbitration, before the plaintiffs could claim any benefit under it, it was necessary for them to show compliance on their part, and the bill of exceptions does not state that they showed or offered to show that they had offered to return the purchase money notes and refund the purchase money paid. Hence, no error was committed in excluding the testimony referred to.

No reversible error has been shown and the judgment is affirmed.

*Affirmed.*